728 So.2d 516 (1999)
GENERAL MOTORS CORPORATION, Plaintiff-Appellant,
v.
Willie DARBY, Jr., et al., Defendants-Appellees.
No. 31,516-CA.
Court of Appeal of Louisiana, Second Circuit.
January 22, 1999.
*517 Phelps Dunbar, L.L.P. By Freddie Pitcher, Jr., Baton Rouge, Counsel for Appellant.
Troy E. Bain, Richard M. John, Shreveport, Allen, Godwin, Morris & Laurenzi By Samuel Morris, Timothy Taylor, Memphis, TN, Counsel for Appellees, Willie Darby, Jr., et al.
J. Jerome Burden, Baton Rouge, Counsel for Appellee, The Administrator, Office of Employment Security of the Department of Labor.
BEFORE BROWN, STEWART & PEATROSS, JJ.
PEATROSS, J.
On November 27, 1996, Willie Darby, Jr., and approximately 1,900 other employees of the Shreveport, Louisiana, General Motors facility (Shreveport Employees) were awarded unemployment benefits by the Louisiana Department of Labor for the period of November 1, 1996, through November 8, 1996, for the shutdown of that facility. The ruling was appealed by General Motors Corporation (GM) to an Administrative Law Tribunal and the ruling was upheld by opinion dated March 23, 1997.
GM appealed the Administrative Law Judge's (ALJ) opinion to the Board of Review (the Board) which found no error and adopted the opinion as its own. GM then filed petitions to review the Board's decision in all nine parishes in which the Shreveport Employees resided. The petitions were all consolidated and transferred to Caddo Parish, First Judicial District Court, where the trial court also found there was sufficient competent evidence to support the ALJ's ruling which was adopted by the Board. It is from the trial court's judgment that GM appeals. For the reasons stated herein, we affirm.

Facts
GM operates one of its assembly plants in Shreveport, Louisiana. This particular plant employs over 2,700 employees and produces Chevrolet S-10s, GM Sonomas and Isuzu trucks.
The Shreveport Employees are all hourly wage earners who are represented, for collective bargaining purposes, by the International Union of the United Automobile, Aerospace and Agricultural Workers of America (UAW), specifically, Local Union No. 2166 in Shreveport. A local collective bargaining agreement between Local 2166 and the Shreveport GM management controls the employment terms specific to the Shreveport plant. There is also a national agreement between the International UAW and GM Corporate that controls the broader nationwide employment conditions which affect all UAW members employed by GM, including the Shreveport Employees.
Both the local and national 1993 agreements were to expire on September 14, 1996. National negotiations between GM and UAW began in June 1996, with the local negotiations beginning in July 1996.[1] The National Agreement was extended beyond its original expiration date of September 14, 1996, pending negotiations due to unresolved issues. The Shreveport plant, however, continued to operate under the expired 1993 local contract. On October 24, 1996, the UAW Vice *518 President, who was also the Director of the UAW-GM division, gave the required three-day notice that UAW was terminating the National Agreement as of October 27, 1996.
At the time of the expiration of the National Agreement, there were only two primary issues remaining, that of job security and the out-sourcing of work to non-UAW represented operations. With the exception of those two issues, GM was willing to accept the pattern agreement.
The Indianapolis plant (Metals plant), which is represented by Local 23, is part of GM's Metal Fabricating Division and is the exclusive provider of sheet metal stamping for GM's North American Operations. It provides the sheet metal parts, such as doors, roofs and panels, for virtually all GM truck products, including those assembled in Shreveport. The Metals plant supplies these parts to Shreveport on a "just-in-time" basis, meaning there is very little inventory kept at the Shreveport site. The components are shipped, usually by rail, on a daily basis and are basically used as they are received.
On October 28, 1996, International UAW sent one of its high ranking representatives to Indianapolis to assist in the local negotiations.[2] The representative stated that there was no strike deadline at that time. The next day, however, he announced a strike deadline of 6:00 p.m. that same evening. At the time of the announcement, there were still over 160 open union demands and approximately 350 grievances, in addition to 5 categories of management demands pending. The National Agreement also had not been reached at that time.
Unfortunately, there was no local process in place by which the parties could deal with so many open issues by the 6:00 p.m. deadline. Local 23 was apparently unwilling to assist in developing a process to deal with the issues. In fact, Local 23 insisted on discussing all issues at the main table (as opposed to appointing committees to deal with various issues simultaneously) and refused to group the issues so they could deal with several issues at once. This made settlement by the anticipated deadline impossible. At approximately 5:20 p.m., word was received from International UAW to begin the strike.
When the Shreveport facility began production on October 30, 1996, it had a 2.2 day supply (in-house or in transit) of the parts it received exclusively from Indianapolis, which were required for use on all the pickup trucks it assembled. Since Shreveport maintains a very small supply of its inventory and relies on daily rail shipments from Indianapolis to operate, by November 1, 1996, at 11:18 a.m., it ran out of its supplies and was forced to idle approximately 1,900 of its 2,700 employees.[3] National negotiations continued in Detroit until GM and the UAW settled its National Agreement at approximately 1:30 a.m. on Saturday, November 2, 1996, with GM agreeing to accept the pattern contract. By 6:00 p.m. on that same day, the Indianapolis local agreement was settled. The local membership ratified the local agreement on November 3, 1996. Full production did not begin in Indianapolis again until Monday, November 4, 1996, and it was not until November 8, 1996, that Shreveport had a sufficient supply of parts from Indianapolis to operate its assembly lines continuously.

DISCUSSION
The standard of judicial review of decisions made by the administrative law tribunal concerning unemployment benefits is governed by La. R.S. 23:1634, which provides in pertinent part:
... the findings of the board of review as to the facts, if supported by sufficient evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the [reviewing] court shall be confined to questions of law.
Therefore, on judicial review in unemployment compensation cases, the reviewing *519 court must determine whether the findings of fact by the Board are supported by sufficient evidence and, if so, whether the decision of the Board is correct as a matter of law. Toney v. Francis, 618 So.2d 597 (La.App. 2d Cir.1993).
Unemployment benefits are awarded in accordance with La. R.S. 23:1600; disqualification criteria for benefits are provided in La. R.S. 23:1601. In the instant case, we are concerned with La. R.S. 23:1601(4), dealing specifically with labor disputes, which states:
An individual shall be disqualified for benefits:
(4) For any week with respect to which the administrator finds that his unemployment is due to a labor dispute which is in active progress at the factory, establishment, or other premises at which he is or was last employed; but such disqualification shall not apply if it is shown to the satisfaction of the administrator that he is not participating in or interested in the labor dispute which caused his unemployment. For the purposes of this Subsection, if separate branches of work, which are commonly conducted as separate businesses in separate premises, are conducted in separate departments of the same premises, each such department shall be deemed to be a separate factory, establishment or other premises.
In determining whether the Shreveport Employees are disqualified from receiving unemployment benefits, we are obliged under the statute to ascertain whether a labor dispute was in active progress at the establishment where they last worked and in which they participated or had an interest. In so determining, we find that the record supports the ALJ's and the Board's conclusion of law that the Shreveport Employees did not participate in a labor dispute in active progress at the Shreveport facility, which operates as a separate factory and establishment from Indianapolis.
The trial court, in affirming that finding, opined that the Supreme Court's analysis in National Gypsum Co. v. Administrator, Louisiana Department of Employment Security, 313 So.2d 230 (La.1975), was the final word in defining a labor dispute in active progress.[4] In that case, the Supreme Court stated, "that unemployment due to a labor dispute in active progress includes only unemployment resulting from labor disputes in which the employee himself actively engages in refusing to work." (Emphasis ours). The trial court went on to say that, although the facts of National Gypsum were distinguishable, the Supreme Court's interpretation of the law had not changed. We agree.
Although, in the instant case, GM was merely reacting to the situation in the idling of the Shreveport Employees, the Employees themselves did not take any active role in the work stoppage. They reported for work and were ready, willing and able to perform their duties on November 1, 1996. The fact that work was not available to them was beyond their control. We find, therefore, that although factually distinguishable, the principles set forth in National Gypsum are applicable here.
The fact that GM-Shreveport was forced to idle over 1,900 employees was not the result of any action taken by the Shreveport Employees; and, therefore, they should not have to suffer because of it. Having found that there was no active labor dispute in progress at GM-Shreveport, we, therefore, conclude that the Shreveport Employees were entitled to receive unemployment benefits for the period of November 1, 1996, through November 8, 1996.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed. All costs are assessed to the Plaintiff.
AFFIRMED.
NOTES
[1] Labor negotiations in the automobile industry are usually conducted between the UAW and "The Big Three" automobile manufacturers (GM, Ford and Chrysler) at the same time. Normally, all of The Big Three's National Agreements are scheduled to expire at the same time.

At the inception of national negotiations, the International UAW will usually select a "target" company from The Big Three with which to first negotiate, with the objective of developing a "pattern agreement" and then urging the other two companies to accept that same pattern agreement.
[2] The representative's presence was thought to be unusual by GM as the local agreement rarely, if ever, settled before the National Agreement. That particular representative, however, had also assisted in the 1993 Indianapolis local agreement negotiations.
[3] The employees in the maintenance and environmental departments were not laid off. Only those employees affected by the shortage of supplies were laid off.
[4] The parties in National Gypsum, supra, were embroiled in heated negotiations over labor conditions. Having reached an impasse, the employer locked the plant gates and refused to allow the employees to report for work until the dispute was resolved, thus preventing the employees from earning an income to support themselves and their families. Placed in this economic dilemma by the employer, the employees were forced to give in and agree to the employer's conditions.