ADKINS ET AL. *v.* INDIANA EMPLOYMENT SECURITY DIVISION ET AL.

[No. 17,549.   Filed December 10, 1946.]

134

*Russell J. Dean,* and *Robert L. Carrico,* both of Indianapolis, for appellant.

*George Rose,* of Indianapolis, for appellee.

HAMILTON, P. J.—This is an appeal from the Review Board of the Indiana Employment Security Division of the State of Indiana, wherein certain claims by the appellants, employees of appellee Insley Manufacturing Corporation, hereinafter referred to as "employer," for waiting period and benefit rights under the Indiana Employment Security Act, § 52-1501 *et seq.,* Burns' 1933 (Supp.), were denied, pursuant to the provisions of § 7 (f) (3) of the Act. § 52-1507, Burns' 1933 (Supp.).

The error assigned is that the decision of the Review Board is contrary to law.

The evidence most favorable to the appellees supports the finding of the following facts: On November 9, 1945, the employer operated a machine shop, whose bargaining unit was The International Association of Machinists, Local No. 1840, and which machine shop was under a valid bargaining agreement then in full force

and effect. During the noon hour a controversy arose between the general machine shop foreman and the local's chief steward over the use of the telephone in the foreman's office and the procedure to be followed in respect to a grievance concerning another employee. It was the duty of said steward to discuss employees' labor grievances with the foreman. Heated words were exchanged and some of the employees walked out of the shop with the steward into the yard where the group held a rump meeting or caucus, and by reason thereof some of the employees failed to report back to their places of work at the close of the lunch period. Many were from 30 to 45 minutes late in so reporting back for work. During their tardiness the management removed the time cards from their places in the clock rack for the purpose of marking thereon the time lost from work because of the rump caucus. The removal of the cards did not mean that the employee whose card was missing, was discharged. Thirty-six minutes after the close of the lunch period the employees telephoned their local union officials, who ordered the men to return to work, and thereupon most of them did so. Some of the employees worked for a short time but upon discovering that their time cards were not in the clock rack, they assumed they were not being paid for their time, and they again stopped working and walked out. The men left the shop the second time without being ordered out by the employer. The union representatives appeared at the office of the employer and made a demand that the employees be paid for the 36 minutes, or more, of lost time, and made a further demand that the time cards be replaced in the clock rack. The employer refused to comply with these demands, and thereupon a stoppage of work occurred and the 3:30 p.m. shift of employees did not enter the shop. The work stoppage continued

from November 9, 1945, until December 10, 1945. After November 9, 1945, a few employees reported for work, but were advised by the gatemen that the machine shop was closed. The machine shop was shut down because a full shift of employees did not report for work at any one time after the controversy on November 9, 1945, and the failure of the machine shop to operate forced the other departments of the plant to shut down pending the negotiations hereafter mentioned. Several days later picket lines were placed around the machine shop. The pickets carried banners bearing the words: "Company Unfair to Labor—Employees Locked Out." At a conference held on November 14, 1945, between representatives of the employer and the officials of the union, no agreement or settlement was reached regarding resumption of operations. The union, as the machinists' bargaining agent, later requested a hearing before the United States Conciliation Service and did have hearings on two separate occasions. The placing of responsibility for the stoppage of work on November 9, 1945, and thereafter, was in dispute with the union contending there had been a lockout by the employer and the employer contending that the action of the employees in walking out on November 9 constituted an unauthorized and unlawful strike. Finally, an agreement was reached whereby a change in the grievance procedure and other minor changes were made in the contract which was in force on November 9, 1945. The agreement was reached and negotiations ended on December 10, 1945, and operations in the shop resumed thereafter. At all of the meetings held on and after November 9, 1945, and until the agreement was reached on December 10, 1945, the management was represented by its officials and attorneys and the union, as bargaining agent, represented the employees of the machine shop. The

subject discussed at all of these meetings involved the working conditions and terms of employment in the machine shop.

Upon such evidence the Review Board held that: "there was a stoppage of work due to a labor dispute and claimants are disqualified for waiting period or benefit rights."

The applicable language of Section 7 (f) (3) of the Indiana Employment Security Act, § 52-1507, Burns' 1933 (Supp.), reads as follows:

"(f) Disqualification for Benefits. An individual shall be ineligible for waiting period or benefit rights: . . .

"(3) For any week with respect to which the board finds that his total or partial or part-total unemployment *is due to a stoppage of work which exists because of a labor dispute* at the factory, establishment, or other premises at which he was last employed. . . ." (Our italics.)

The sole question presented for our determination is whether or not the foregoing facts are sufficient to sustain the finding of the Review Board that appellants' unemployment was the result of a labor dispute within the meaning of such term as contained in Section 7 (f) (3), *supra*.

In construing the meaning of certain words contained in a statute, the legislative definition of the same words in another act (although not conclusive) is entitled to consideration in construing the same words when used in another statute upon the same, or related, subject. *Ralston* v. *Ryan* (1940), 217 Ind. 482, 484, 29 N. E. (2d) 202; *State, ex rel.* v. *Grange* (1929), 200 Ind. 506, 509, 165 N. E. 239; *Dreves* v. *Oslo School Twp. of Elkhart* (1940), 217 Ind. 388, 28 N. E. (2d) 252.

Furthermore, where the legislature has defined the

meaning of words used in a statute, the courts are bound- by that construction, though otherwise the language would be held to mean a different thing. *State, ex rel.* v. *Grange, supra; Gr. Inc. Tax Dept.* v. *Harbison-Walker Ref. Co.* (1943), 113 Ind. App. 695, 48 N. E. (2d) 834.

Having the foregoing rules of construction in mind, we find that in 1933 the legislature enacted an act regulating the granting of injunctions and restraining orders by courts involving or growing out of a "labor dispute." Acts of 1933, ch. 12, p. 28, § 40-501 *et seq.,* Burns' 1933.

In § 13 of the Act, § 40-513, Burns' 1933, the legislature defined the meaning of the term "labor dispute" as follows:

"(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

The Indiana Employment Security Act was originally enacted at the special session held in 1936, and although it has been amended in each session of the legislature since, the legislature has never seen fit to enact as a part of said act a definition and meaning of the term "labor dispute" different from the definition given in 1933 in the anti-injunction labor act. Therefore, we are justified in assuming that the legislature intended that the words "labor dispute" as used in § 52-1507, *supra,* should be given the same meaning and construction as defined by the legislature in the anti-injunction act enacted in 1933.

In the case of *Walter Bledsoe Coal Co.* v. *Review*

*Board, etc.* (1943), 221 Ind. 16, 46 N. E. (2d) 477, the Supreme Court had occasion to construe the meaning of the term "labor dispute" as contained in said § 52-1507 (f) (3), *supra*. On pages 20, 21, and 22 of 221 Ind., the court says: "What is meant by the term 'labor dispute' has been the subject of our inquiry, and, to determine the question, we have looked to the entire act and its purposes. The declared purpose quoted above is to provide benefits for persons unemployed through no fault of their own, and to encourage stabilization in employment.

". . . Thus 'fault' must be construed as meaning failure or volition. This construction is consistent with the provision that there shall be no benefits paid if unemployment is due to a stoppage of work because of a labor dispute. It is perfectly legal for employees to contend for better wages and working conditions and to refuse work if their demands are not complied with, and it cannot legally be said that such action is worthy of censure or that it constitutes wrongdoing. It must be concluded that the purpose of the act was to provide benefits to those who were involuntarily out of employment, and not to finance those who were willingly and deliberately refusing to work because of a refusal of their employers to accede to demands for higher wages.

" . . . Here was a disagreement between the employer and the employees as a whole as to wages; a demand by employees for new and different terms, and a refusal of the employer to comply; and a refusal of the employees to work as a consequence. It was a controversy. This was a strike in the ordinary meaning of the word. Webster defines a 'strike' as: 'Act of quitting work; specif., such an act done by mutual understanding by a body of workmen as a means of

enforcing compliance with demands made on their employer; a stopping of work by workmen in order to obtain or resist a change in conditions of employment.' 'To quit work in order to obtain, or resist, a change in conditions of employment.' Webster's New International Dictionary, Second Edition. Strikes are generally considered as coercive. This strike was the result of disagreement after negotiations about wages and working conditions. The fact that the contract under which the employees had been working had expired is of no importance. They were unemployed because of their refusal of an offer of work for wages and under conditions identical with those provided in their expired contract."

Appellants earnestly contend that they were unemployed because of a "lockout" and not the result of a "strike" or a "labor dispute." The State of Washington has an unemployment compensation act worded the same as Section 7 (f) (3) of the Indiana Employment Security Act. In the case of *In re North River Logging Co.* (1942), 15 Wash. (2d) 204, 130 P. (2d) 64, the Supreme Court of Washington considered the question as to whether or not a "lockout" came within the meaning and purview of the term "labor dispute." We quote with approval the following language from the court's opinion: "So, the question for determination, as it finally resolves itself, is whether or not a lockout is a labor dispute in contemplation of Rem. Rev. Stat. Supp. § 9998-105 (e). For it is clear that the shutdown from September 9th to October 14th was a lockout in the generally accepted definition of the terms: A suspension of operations by the employer resulting from a dispute with his employees over wages, hours, or working conditions. That a lockout is a labor dispute

in contemplation of the unemployment compensation act, we think equally clear for several reasons:

"First. Viewed in its social and economic aspects, the lockout is a weapon in the hands of the employers which is a counterpart to the weapon of strike held by the workers. 'A strike is cessation of work by employees in an effort to get for the employees more desirable terms. A lockout is a cessation of the furnishing of work to employees in an effort to get for the employer more desirable terms.' *Iron Molders' Union* v. *Allis-Chalmers Co.*, 7 Cir., 166 F. 45, 52, 20 L. R. A., N. S., 315.

"Second. The essential features of our unemployment compensation act are borrowed from the English acts, the original of which was passed in 1911. It is important, therefore, to ascertain the construction placed upon the British acts in construing our own. For it is a general rule of statutory construction that a statute adopted from another state or country is presumed to have been taken with the construction there placed upon it. In *re Third, Fourth & Fifth Avenues, Seattle,* 49 Wash. 109, 94 P. 1075, 95 P. 862; *Bickford* v. *Eschbach,* 167 Wash. 357, 9 P. (2d) 376.

"The English decisions are uniform in holding that a lockout is a labor dispute in contemplation of the national insurance acts. . . .

"Fifth. Under facts basically indistinguishable from those in the case at bar, several courts, construing statutes identical or similar to Rem. Rev. Stat. Supp. § 9998-105(e), have held that the unemployment for which the claims were made grew out of a labor dispute. *Barnes* v. *Hall,* 285 Ky. 160, 146 S. W. (2d) 929; *Hall* v. *Barnes,* 314 U. S. 628, 62 S. Ct. 59; *Block Coal & Coke Co.* v. *United Mine Workers, etc.,* 177 Tenn. 247, 148 S. W. (2d) 364, 149 S. W. (2d) 469; *Dept. of Industrial*

*Relations* v. *Pesnell,* 29 Ala. App. 528, 199 So. 720." See also: *Dallas Fuel Co.* v. *Horne* (1941), 230 Iowa 1148, 300 N. W. 303; *Caterpillar Tractor Co.* v. *Durkin* (1942), 380 Ill. 11, 42 N. E. (2d) 541; *Board of Review* v. *Mid Continent Petroleum Corporation* (1943), 193 Okla. 36, 141 P. (2d) 69.

It is the duty of the courts to construe a statute so as to carry out the legislative intention in enacting the law and to prevent an evasion thereof. *Sharp* v. *State, ex rel.* (1913), 54 Ind. App. 182, 194, 99 N. E. 1072; *Watson* v. *Burnett* (1939), 216 Ind. 216, 221, 23 N. E. (2d) 420.

It is not for the courts to add to a statute by interpretation to embrace cases which were excluded by the legislature. *Kunkalman* v. *Gibson* (1908), 117 Ind. 503, 509, 84 N. E. 985; *Pere Marquette R. Co.* v. *Baertz* (1905), 36 Ind. App. 408, 414, 74 N. E. 51.

As we view the evidence in this case, it is immaterial whether appellants' unemployment was caused by a "strike" or a "lockout" for the reason that in either event it is crystal clear that such unemployment was the direct and immediate result of the "controversy concerning terms and conditions of employment," which arose on November 9, 1945, between the employer and employees in the employer's machine shop, and, therefore, such unemployment was the result of a "labor dispute" within the meaning and purview of Section 7 (f) (3) of the Indiana Employment Security Act. *Walter Bledsoe Coal Co.* v. *Review Board, etc., supra; In re North River Logging Co., supra.*

The decision of the Review Board was not contrary to law and must be affirmed.

Judgment affirmed.

NOTE.—Reported in 70 N. E. (2d) 31.