Billy H. AARON, and each of the other claimants whose names are listed under Case Nos. 70–LD–186, 70–LD–190, 70–LD–191, 70–LD–199, 70–LD–200, 70–LD–201, 70–LD–202, 70–LD–203, 70–LD–204, 74–A–3401, 74–A–3402, 74–A–3403, Appellants (Claimants),

v.

REVIEW BOARD OF the INDIANA EMPLOYMENT SECURITY DIVISION, William H. Skinner and David L. Adams, as members of and constituting the Review Board of the Indiana Employment Security Division, and General Motors Corporation (Employer), Appellees,

and

GENERAL MOTORS CORPORATION, Appellant,

v.

REVIEW BOARD OF the INDIANA EMPLOYMENT SECURITY DIVISION, William H. Skinner, Ralph F. Miles and David L. Adams, as members constituting the Review Board of the Indiana Employment Security Division,

and

Phillip E. Aaron, and each of the other claimants whose names are listed under Case Nos. 70–LD–186, 70–LD–190, and 70–LD–191, Appellees.

No. 2–179A13.

Court of Appeals of Indiana, Second District.

Feb. 3, 1981.
Rehearing Denied March 31, 1981.

Forrest Bowman, Jr., Indianapolis, for appellant, claimants.

Barnes, Hickam, Pantzer & Boyd, Indianapolis, Otis M. Smith, James R. Wheatley, Detroit, Mich., for General Motors Corp.

Linley E. Pearson, Atty. Gen., Philip R. Blowers, Deputy Atty. Gen., Indianapolis, for appellee Review Bd.

BUCHANAN, Chief Judge.

## CASE SUMMARY

General Motors Corporation (GM) appeals from a decision [1] of the Review Board of

1. The decision reads, in pertinent part, that On August 15, 1970, the United Auto Workers of America, as representative of the claimants herein, notified the employer that the national labor agreement between it and the employer would terminate as of 11:59 P.M. on September 14, 1970, and on that date a "selective strike" was begun against the corporate facilities of General Motors across the United States; however, certain plants located in the State of Indiana were "exempted" from the strike because they were suppliers to the competitors of the corporation as well as suppliers to General Motors Corporation itself.

The "exempt" plants, which were not immediately struck, were Delco Remy in Anderson, Detroit Diesel-Allison in Indianapolis, and Delco Electronics, in Kokomo; however, the Kokomo plant was later removed from the "exempt" list and did go on strike effective September 24, 1970. The evidence does show that many of the Kokomo employees were laid off prior to the effective date of that strike due to lack of work. The other above mentioned "exempt" plants were never struck by the UAW; however, there was a curtailment of employment at those locations due to the fact that supplies from other struck plants were unobtainable due to the nationwide strike. Referee Morris found that the employees of the "exempt" plants, except Kokomo, did not voluntarily stop working during the period of the strike beginning September 14, 1970, to November 23, 1970, and, therefore, were not disqualified for benefits under the provisions of Chapter 15–3 of the Indiana Employment Security Act during that period of time. Referee Morris further found that the employees of the "exempt" plant at Kokomo, who were laid off prior to September 24, 1970, were not disqualified for benefits under the provisions of Chapter 15–3 of the Act from the date of their individual layoffs to November 23, 1970. It was further found from the evidence that pursuant to a supplemental agreement of November 13, 1970, between UAW and General Motors, certain necessary time for local negotiations and the resumption of production at the struck and "exempt" plants was allowed after the ratification of the new national agreement as of November 23, 1970, and that it had not been shown that the employer had abused or breached the agreement entered into on November 13, 1970. The employees of the Kokomo plant not laid off prior to September 24, 1970, which was the date that that plant was removed from the "exempt" list, were disqualified for benefits after that

the Indiana Employment Security Division awarding unemployment benefits to employees (Claimants) laid off during a ten week nationwide United Auto Workers strike in 1970, claiming a labor dispute existed at its factories exempted from the strike; and the claimants in cases which have been consolidated on appeal claim benefits were wrongfully denied to striking and non-striking employees during the start-up period after the termination of the strike, and that the Review Board erroneously concluded that money received from the Strike Assistance Fund was deductible from State unemployment compensation benefits.

We affirm in part and reverse in part.

## FACTS

From July 15, to November 23, 1970, General Motors Corporation (GM) and the International Union United Auto Workers (UAW) bargained over the terms and condi-

tions of employment of GM employees. The UAW acted as the exclusive collective bargaining agent for GM employees, the bargaining unit consisting of production and maintenance employees of 155 GM plants across the nation, including nine locations in Indiana.

Negotiations centered on demands by the UAW for substantial changes in a national agreement covering all employees in the company-wide bargaining unit, upon which all terms and conditions of employment depended, including those contained in the various local supplements being negotiated at the same time. There was controversy over the basic terms and conditions of employment of all employees in the bargaining unit at all locations. According to the findings there were no local issues involved during the period prior to November 23 (the date of ratification of the national agreement).[2]

date and until they were individually returned to their employment; however, the employees of Detroit Deisel-Allison [sic], Indianapolis, who were laid off or discharged after September 24, 1970, were eligible for benefits under the provision of Chapter 15–3 of the Act since that plant did, in fact, remain on the "exempt" list.

In the second referee's decision issued by Edgar N. Harbit, the issue is whether or not the claimants employed at Delco Remy Division, Anderson; Delco Electronics Division, Kokomo; and Allison Division, GMC, Indianapolis, had received deductible income for services performed during the period of the work stoppage beginning September 14, 1970, to 12:01 A.M. November 23, 1970. The record indicates that payments were made to those claimants pursuant to a strike assistance program of the UAW International, and that these strike assistance payments were made pursuant to the claimants performing certain duties assigned by their union such as picketing and participating in educational programs. The record further shows that the claimants were only eligible for this strike assistance if they did engage in the prescribed activities, and that all such payments were considered as deductible.

The issue of whether or not the question of the deductibility of income had been raised in a timely manner in accordance with the provisions of Chapter 17–2 of the Indiana Employment Security Act and Regulation 802 was resolved in favor of the employer, and it was held that the referee did, in fact, have

jurisdiction to hear the case on its merits and to rule on the question of deductible income under the provisions of Chapter 5, Section 1, of the Indiana Employment Security Act. The referee then, after considering the payments received by the claimants, ruled that they had, in fact, received deductible income during the period of the work stoppage being September 14, 1970, to 12:01 A.M. November 23, 1970.

FINDINGS AND CONCLUSIONS: The Review Board now, by reference, adopts the findings and conclusions made by Referee Douglas J. Morris in his decision mailed August 26, 1974. It further now, by reference, adopts the findings and conclusions made by Referee Edgar N. Harbit in his decision mailed January 3, 1975.

DECISION: The decision of Referee Morris mailed August 26, 1974 and that of Referee Harbit mailed January 3, 1975, are hereby affirmed this 9 day of November, 1978.

REVIEW BOARD
/s/ William H. Skinner, Chairman
/s/ Ralph F. Miles, Member
R., at 301–02.

2. The findings of the Board expressly state that "it was further found from the evidence that pursuant to a supplemental agreement of November 13, 1970, between UAW and General Motors, certain necessary time for local negotiations and the resumption of production at the struck and "exempt" plants was allowed after the ratification of the new national agreement as of November 23, 1970." (R., at 301). We

The dispute culminated in a nationwide strike beginning September 14 and not ending until November 23, 1970. At that time more than 320,000 UAW members struck GM at 138 plants across the country on orders of their union, including six of the nine locations in Indiana. The strike was in support of the UAW's position on all issues in dispute, as authorized by strike vote at all locations, including all nine in Indiana. It was conducted by the union pursuant to a planned selective strike strategy designed to apply maximum economic pressure against GM by completely shutting down all GM automotive production but offering to continue to work at those plants which produced parts for GM's competitors. Accordingly, the UAW ordered its members to continue work at 17 such locations, including Delco Remy in Anderson, Detroit Diesel Allison in Indianapolis, and Delco Electronics in Kokomo. The UAW subsequently removed Delco Electronics from its "exempt" list on September 24, and ordered its members there to join the strike, which they did. Consequently, of the nine plants in Indiana, only two were exempt from the strike.

The strike had the expected effect of disrupting the company's automotive operations at all locations, which are admittedly highly integrated and interdependent. Production at the two plants, which were not actively struck pursuant to the union's strategy, was substantially curtailed as a direct and inevitable result of the strike, beginning immediately after the strike started and not ending until normal production could be resumed after the national strike ended and the new national agreement became effective on November 23, 1970.

The claimants at the exempt Indiana locations participated in *and financed* the national strike through the UAW Strike Assistance Program. The Board accepted the referee's ultimate conclusion that the employees of the exempt plants were not dis-

are led to conclude that purely national issues were bargained prior to November 23, with

qualified because "whatever curtailment of employment there was at either of said 'exempt' plants was due to the ultimate disruption of supplies from struck plants to corporation plants and to competitor plants. Such disruption was not due to a voluntary stoppage of work existing because of the labor dispute at any of said 'exempt' plants."

More than 20,000 claims for unemployment compensation were filed by UAW members who were unemployed as a result of these events at the nine Indiana locations. They fall into two categories.

First, the claimants at Delco Remy, Detroit Diesel Allison and Delco Electronics (exempt plants) who, at the outset of the strike, were directed to continue work pursuant to the UAW's national strike strategy, but who predictably became unemployed when production at those plants was substantially curtailed as a result of the strike. They were instructed to file these claims as a condition to drawing strike benefits and to reimburse the UAW strike fund out of any unemployment compensation they may receive. Benefits were claimed for the entire period of their unemployment, including, with respect to those members at Delco Electronics who were laid off as a result of the national strike before September 24, the entire period they were actively on strike thereafter.

Second, the claimants at all locations for the period beginning with the termination of the strike on November 23 until their recall when production was resumed on a normal basis at their respective locations.

The Review Board concluded that monies received from the Strike Assistance Plan were deductible income pursuant to the terms of the Indiana Employment Security Act.

### ISSUES

GM presents the following issue for review:

local issues, etc., being concluded thereafter.

1. Whether employees at an "exempt" plant whose unemployment results from a selective strike of other plants in their labor union can receive unemployment benefits.

Claimants present two issues for review:

2. Whether all claimants including employees at struck plants were eligible for unemployment benefits during post-strike start-up delay, and

3. Whether the Review Board has jurisdiction to decide the issue of deductible income and whether it then properly determined that the UAW's Strike Assistance Plan payments to laid-off employees constituted deductible income.

## DECISION

*ISSUE ONE*—Whether employees at an "exempt" plant whose unemployment results from a selective strike of other plants in their labor union can receive unemployment benefits.

■ *CONCLUSION*—Employees of an exempt plant whose unemployment results from a selective strike of other plants in their labor union are not entitled to unemployment benefits. The Review Board's determination that the curtailed production at the exempt plants was *not* due to a labor dispute at those facilities was erroneous. As a matter of law there was a labor dispute "at" the exempt plant.

In the interlude between June of 1971 when *Artim Transportation System, Inc. v. Review Board of Indiana Employment Security Division*, (1971) 149 Ind.App. 137, 271 N.E.2d 494 (transfer denied) was decided by this court and now, there have been no other Indiana cases involving payment of unemployment compensation benefits in selective or "whipsaw" strikes.

*Artim* decided that non-striking union employees of one of a multi-employer national bargaining unit negotiating with the union for a master contract were entitled to benefits because there was not "a labor dispute" at their "establishment." However, as the concurring opinion indicates, the "confused record" is "bare of any showing that the strike ... involved issues which were involved in the joint negotiations" or whether there were "genuine local issues." Thus *Artim* is distinguishable.

This case presents a more striking example than *Artim* of a situation in which employees at different plants engage in concerted efforts to achieve their contract goals. In *Artim*, the appellant-employer was a member of a trucking company negotiation committee, other members of which were being struck by the union. Here, the exempt plants are units of the *same corporation* with which the UAW unquestionably had a dispute. Whether the focus is on part of the assembly line within a plant or a series of assembly lines in various integrated plants producing certain products, a strike in one part affects all parts. *See Adams v. Review Board*, (1951) 121 Ind. App. 273, 98 N.E.2d 681.

An even more compelling argument against the finding of the Board in this case is based on the fact that the so-called non-disputing workers at the exempt plants share in the benefits for which the strikers were militating. The "exempt" claimants thus receive the dividends flowing from the orchestrated work stoppages, and even financed the strike through the UAW Strike Assistance Program. To maintain that they were non-disputants merely by virtue of the geographic location of their work places is an arbitrary determination. The union elected to place the plants in question here on the exempt list. Its expressed tactical reason for so doing was to make it possible for exempted employees to serve the strike effort by producing parts for GM's competitors.

There is here a joint effort by all of the parties to negotiate a single master contract by which they are all bound and by which they all presumably benefit. The act of part of the whole must be considered the act of the whole. Were it not so, this joint effort to peaceably negotiate an industry-wide contract results in a "heads-I-win-tails-you-lose" application of the statute. A strike against a single plant or group of

plants during such negotiation imposes sanctions and economic pressure on the corporation as a whole and thereby creates a labor dispute which effects and touches and concerns all parties alike at each "establishment." The possibility of multiple geographically separate establishments is recognized by the statute which says: "factory, establishment, *or other premises* at which he was last employed." I.C. 22–4–15–3.

The case law in Indiana and other jurisdictions with statutes similar to ours reflects the relationship between non-striking beneficiaries of a dispute and unemployment compensation payments. In *Adams v. Review Board, supra*, the court held that an unauthorized strike at one point in the assembly process was a sufficient labor dispute to render other "non-striking" employees ineligible for benefits, stating:

> The question is, did the ultimate stoppage trace back to the dispute as a matter of effect and cause. When thus analyzed, all the facts show that it did. If all production workers were interested directly in the dispute initially, the character of their interest remained direct until the dispute ceased to be a dispute.

*Id.* at 684.

Similarly, Massachusetts with a statute resembling ours, has decided that persons closely connected with, or interested in, a labor dispute, are disqualified from receipt of unemployment benefits. *General Electric Company v. Director of the Division of Employment Security*, (1965) 349 Mass. 358, 208 N.E.2d 234.

■ The scope of an employee's "interest" in a labor dispute, which leads to his disqualification for unemployment compensation, has been broadly defined in Indiana:

> As employees in the bargaining unit, the wages and conditions of the appellants' employment would be affected by the outcome of the dispute, though they did not belong to the union *or participate in the strike*. We, therefore, hold that they were directly interested in the labor dispute which caused the stoppage of work.

*Auker v. Review Board*, (1947) 117 Ind.App. 486, 71 N.E.2d 629, 632 (emphasis added). The "voluntariness" of an individual's participation in a strike is thus irrelevant to his eligibility for benefits.

Even if voluntary participation were required under the case law, it is not uncommon in the law to similarly treat persons who undertake a common objective. The uncontroverted evidence indicates that the Union employees of the exempt plants financed and were the recipients of contract benefits from the strike. It was readily foreseeable to all concerned that there would be work stoppages at exempt plants due to strike-caused disruptions in the market. The principle of attribution is no stranger to the law, so it is not unreasonable that a strike at one "establishment" be considered a labor dispute at another establishment under such circumstances.

Buttressing this application of the statute are certain other words contained therein which state emphatically that an employee is ineligible for benefits if he is "participating in or financing or directly interested in the labor dispute which caused the stoppage of work." I.C. 22–4–15–3. Thus, the statute applies when workers benefit from the outcome of a related strike *or* when they finance the related strike, and certainly when they both benefit from and finance a labor dispute.

That this is manifestly true is demonstrated by the history of the act. The law as originally enacted in 1936 disqualified an individual for benefits "for any week in which it is found by the Board that his total or partial unemployment is due to a stoppage of work which exists because of a strike . . . at the factory or establishment at which he is or was last employed." 1936 Indiana Acts, Ch. 4, § 6(f)(3), p. 80, 95. It was amended to its present form in 1937, substituting the broader term "labor dispute" for "strike," and has remained so ever since, following judicial construction of the term "labor dispute" as encompassing any "controversy concerning terms or conditions of employment."

■ Any requirement of a "fault" standard is therefore not essential to the determination of an individual's eligibility for benefits. It is merely one factor which may or may not exist. The key factor to consider is whether the work stoppage *results* from "controversy concerning the terms and conditions of employment," *not* a characterization of the stoppage as a strike, lockout or layoff. *Adkins v. Indiana Employment Security Division,* (1946) 117 Ind. App. 132, 70 N.E.2d 31. This approach is also supported by a long line of cases from other jurisdictions with statutes similar to Indiana's, which hold employees laid off as the result of whipsaw strikes ineligible for unemployment benefits. *See, e. g., McKinley et al. v. California Employment Stabilization Commission,* (1949) 34 Cal.2d 239, 209 P.2d 602; *Peaden v. M.E.S.C.,* (1959) 355 Mich. 613, 96 N.W.2d 281; *Buzza v. U.C.C.,* (1951) 330 Mich. 223, 47 N.W.2d 11; *Alvarez v. Administrator, Unemployment Compensation,* (1952) 139 Conn. 327, 93 A.2d 298; *Buchholz v. Cummins,* (1955) 6 Ill.2d 382, 128 N.E.2d 900.

■ The subject matter of the strike, rather than the locus, should control. *Unemployment Compensation Commission of Alaska v. Aragon,* (1946) 329 U.S. 143, 67 S.Ct. 245, 91 L.Ed. 136. In *Aragon* the United States Supreme Court held that there was a disqualifying "labor dispute," which caused claimants' unemployment, even though there was no "strike." It further held that the dispute was "at" claimants' establishment in Alaska even though negotiations were conducted through a multi-employer association in San Francisco and Seattle. In the course of that holding, the court said:

Nor can we accept the argument of the majority of the court of appeals that since negotiations between the companies and the workers were carried out in San Francisco and Seattle, the dispute could not be said to be "at" the Alaskan establishments as required by the statute. . . . *It is clear that the subject matter of the dispute related to the operation of the Alaskan establishments.* As a result of

the dispute the normal activities involved in catching and canning salmon were not carried on throughout the 1940 season at any of those establishments. We do not consider significant the fact that the companies and the union did not negotiate at the canneries or on the ships in Alaskan waters.

. . . We conclude that under the circumstances of this case *the dispute was "at the factory,* establishment, or other premises in the sense intended by the Territorial Legislature." (emphasis supplied)

The controlling significance of the *Aragon* decision was pointed up by the Michigan Supreme Court in *Peaden v. M.E.S.C., supra,*

*Aragon* is a leading case, handed down by leading authority. It cannot be distinguished either in principle or fact from the case before us. And its text suggests fair need for uniformity of interpretation of these essentially standard provisions of the unemployment compensation laws of the several states, each being "part of the legislative scheme for unemployment compensation induced by the provisions of the Social Security Act of 1935."

*Id.,* 96 N.W.2d at 287.

■ An employee is directly interested in a labor dispute if his wages and the conditions of his employment will be affected by the work stoppage. *Kemial v. Review Board,* (1947) 117 Ind.App. 357, 72 N.E.2d 238. In light of the discussion regarding the broad definitions used in Indiana case law, *supra,* it makes no difference as to whether the stoppage is a strike, a layoff, etc. The employee's interest in the outcome should control. *Adkins, Kemial, supra.*

For all these reasons we must inevitably conclude that the claimants at the "exempt" plants are ineligible for unemployment benefits.

Our present holding should mitigate some of the confusion introduced into the law of this state by *General Motors Corporation v. Review Board,* (1970) 146 Ind.App. 278, 255 N.E.2d 107 (hereinafter referred to as the 1964 case). The 1964 case dealt with a

labor stoppage which occurred in that year. It is distinguishable on its facts from the case at bar and should not be extended beyond its inherent limitations. In the 1964 case, a national agreement was reached October 5, 1964. Strikes *over local issues* continued for more than a month after that date. The 1964 case therefore had a basis for finding that there was no labor dispute at non-struck plants. That fact situation contrasts markedly from the one presented by the case at bar in which the so-called exempt employees would work under precisely the same contract for which their fellow employees were striking.

■ The basic problem with the Board's decision is that its findings of fact are inconsistent with its conclusion. The Board expressly found that the stoppages of work and consequent unemployment at the "exempt" plants were caused by the strike.[3] The standard of review of administrative decisions requires us to accept this finding without reweighing the evidence. *Department of Financial Institutions v. State Bank of Lizton*, (1969) 253 Ind. 172, 252 N.E.2d 248. We cannot substitute our judgment for that of the administrative body. *Department of Financial Institutions v. Colonial Bank and Trust Company*, (1978) Ind.App., 375 N.E.2d 285. The sole relief we may grant when an administrative decision is found to be unlawful is to vacate the decision and remand to the agency for a further determination. *State et al. v. Marion Superior Court, Civil Division, Room No. 5*, (1979) Ind., 392 N.E.2d 1161. Because of these limitations on our scope of review we cannot entertain the arguments advanced by appellees that causes other than the strike precipitated the unemployment at the "exempt" plants. The Board's findings of fact control, and rather than tamper with those express factual findings, we only review the record to determine if the law was properly applied by the Board to the facts it

found. This court has discussed this process in the past:

At the first level of review, we examine only the relationship between the premises and the conclusion, and ask if the Board's deduction is "reasonable." ... The inquiry at this first level of review may be termed a "question of law."

*Gold Bond Building Products Division, etc. v. Review Board, Indiana*, (1976) 169 Ind. App. 478, 349 N.E.2d 258, 263. *Accord Wolfe v. Review Board*, (1978) Ind.App., 375 N.E.2d 652.

Applying this "first level" of review to the findings of fact and orders entered, we must hold *as a matter of law* that the Board erred in concluding, despite its contrary factual findings, that employees at the so-called "exempt" plants were entitled to benefits. The Board's findings of fact require the law as set forth in the Indiana cases discussed herein be applied to these claimants. They were interested in the outcome of the strike in that they stood to benefit from its successful completion, and, as found by the Board, their unemployment was caused by the strike. Because we must leave undisturbed the Board's determination of facts, we must treat the workers at the exempt plants consistently with their brethren on the picket lines.

We therefore reverse the Board on this issue because its conclusion of law is inconsistent with its findings of fact.

■ In sum, it is our holding that nonstriking union employees of a nationwide, multi-plant, single employer who are participating members in a single contract bargaining negotiation for uniform terms and conditions in which some plants are struck, are parties to a "labor dispute" at their "establishment," and thereby are rendered ineligible for unemployment benefits under the Act.[4]

---

3. "The ... 'exempt' plants were never struck by the UAW; however, there was a curtailment of employment at those locations due to the fact that supplies from other struck plants were unobtainable due to the nationwide

strike." *Decision of the Review Board, R.*, at 301.

4. The Third District of the Indiana Court of Appeals has recently construed a different portion of the same statute that we deal with here. In *Warner Press, Inc. v. Review Board*, (1980)

*ISSUE TWO*—Whether all claimants including employees at struck plants were eligible for benefits for their unemployment during post-strike start-up delay.

■ *CONCLUSION*—We uphold the Board's determination that claimants were not eligible for benefits for their unemployment during post-strike start-up delay.

Claimants urge that the Review Board erred in denying benefits to the striking and non-striking employees for unemployment from November 23, 1970 (the date that the strike terminated and the employees offered to return to work). They argue that the plants were physically operable as of that date and that the start-up delay was attributable to management decisions beyond their control. GM replies that the claimants had the burden of proof in regard to this issue and that they failed to show that GM did not do everything reasonably possible to promptly restore normal business operations. GM further argues that if claimants were originally disqualified they continue to be disqualified, but concedes that if claimants at the exempt plants were not disqualified from receipt of unemployment benefits under the labor dispute section, then they did not become so disqualified at the end of the strike during resumption of normal operations at these plants.[5]

The Review Board found that the parties adopted a callback agreement which specified that employees were to be "recalled to their jobs as soon as the orderly start-up of operations permits" and "as soon as circumstances and conditions permit." Claimants now assert that they submitted detailed uncontradicted evidence that the plants were operable November 23. They also assert that at Delco Electronics management

witnesses admitted the delay was attributable to lack of storage space.[6]

The problem of start-up delay and disqualification of benefits was discussed at length in *Carnegie-Illinois Steel Corp. v. Review Board*, (1947) 117 Ind.App. 379, 72 N.E.2d 662:

We recognize the administrative difficulties involved and we wish to further assert that by this opinion we do not mean to hold that the stoppage of work caused by a labor dispute continues in every case until the employer resumes normal operations. The test is not the resumption of operations by reason of the control or decision of the employer or conditions in speculative factors allegedly asserted by the employer. It must be limited to the delay directly and proximately caused by the labor dispute and the physical factors and conditions created as the direct and natural consequences of the labor dispute. The stoppage of work caused by a labor dispute under such circumstances must not exceed the time which is reasonably necessary and required to physically resume normal operations in such plant or establishments.

*Id.*, 72 N.E.2d at 667.

■ Once employees are disqualified for unemployment benefits, they have the burden of proving that they have become qualified. That is, they must show that the continued unemployment is not the result of the labor dispute but rather is due to independent causes. *Frank Foundries Corporation v. Review Board*, (1949) 119 Ind. App. 693, 88 N.E.2d 160; *Auker v. Review Board, supra.* The question is whether the claimants have disclosed to us that their denial of benefits during the start-up was

---

Ind.App., 413 N.E.2d 1003, Judge Staton defined the term "work stoppage". We deal here with the application of the location language of the same statute. *Warner Press* is thus inapplicable to this case.

5. Having resolved the first issue in favor of GM, our discussion of the eligibility of striking employees for start-up delay compensation is also applicable to so-called "exempt" workers.

6. Such an admission, if made by management, does not aid claimants. In *General Electric Company v. Unemployment Compensation Board*, (1978) 35 Pa.Cmwlth. 32, 384 A.2d 1025, the court determined that G.E.'s economic decision to lay off claimants because it would not be economically feasible to build inventory when no safe storage space was available was the result of the work stoppage due to a labor dispute thereby precluding unemployment benefits.

erroneous as a matter of law since the award was negative in nature as to them. The Board made affirmative findings in reaching its negative conclusion which clearly set forth its reason for the denial. We find that reason amply supported by the evidence. The evidence is as follows:

Six Indiana plants were involved in the strike. The strike ended November 23, and evidence regarding the ability of plants to resume operations was conflicting. William A. Brunstad, a member of GM's labor relations staff, testified that GM was not able to resume normal production on that date, but rather presumption was a gradual process. He explained that any assembly plant has start-up problems after having been down for such a length of time and that the status of the stock of parts at each plant affected the ability of plants to begin production.

Regarding Central Foundry, it was stated that normal operations could not have been resumed there before December 7. This was contradicted in part by the testimony of another employee who stated that the furnaces were operable there on November 23. Evidence was introduced that at Delco Electronics there was no make-ready work necessary to start up the pressroom or the screw machine department and that the circuit board department was physically operable the day after Thanksgiving. However, the department which makes transistor bases had no orders for parts and accordingly employees were not called back until December 7.

George Mapes, chairman of the bargaining committee at Chevrolet Division, Muncie, stated that the only start-up function necessary to make the assembly lines operational was the punching of a button to turn on electricity. Although on direct examination Mapes testified there was adequate storage space, he admitted that he did not take into account the amount of space each transmission takes up when packed and racked. He indicated on cross-examination that storage facilities at that time were very limited.

With respect to Chevrolet Division, Indianapolis, a supervisor testified that in light of the information available to the plant about shipping schedules, full operations could not have begun prior to December 1.

A superintendent at Delco Battery explained that their start-up schedule was affected by the fact that certain machinery was subject to deterioration after having been down for the strike period and had to be checked. In addition, the bulk of the inventory had to be recharged and re-dated for warranty purposes.

Fisher Body Division resumed normal production on November 23. Lewis Petry, superintendent of production control, scheduling and traffic stated that because of lack of settlements in certain assembly plants, orders could not be shipped to those plants and the result was excessive finished inventory which "filled up all of our storage equipment in every nook and cranny we had in the plant, even in the aisles which is against our rules, until we reached the saturation point and had to back off." Accordingly, some people were sent home between December 1 and December 14.

Guide Lamp Division took five to seven days to resume operation on a normal basis. There was testimony that several internal problems had to be overcome before production could begin, i. e., premixing a set molding compound, cleaning filters, reheating furnaces as well as checking electrical work, wiring, and plumbing.

Referee Morris, after hearing all of the evidence, determined that "it is not substantially evident, to meet the burden of proof, that the employer abused or breached said agreement." [7]

7. Claimants argue that whether the employer "breached" said agreement is irrelevant since such an agreement is void as against public policy. To support their proposition, claimants cite *Jenkins v. Review Board*, (1965) 138 Ind. App. 12, 211 N.E.2d 42, which stated in reference to a forced retirement agreement that a union in concert with an employer could not waive any of the employees' rights under the unemployment act. Certainly *Jenkins* does not stand for the proposition that every union-employer contract implicitly involving unemploy-

So we must conclude that the Board appropriately exercised its discretion in resolving the conflicting evidence. On the basis of this evidence we cannot say that the Board erred in denying relief to claimants at the struck plants during the start-up period.

*ISSUE THREE*—Whether the Review Board had jurisdiction to decide the issue of deductible income and whether it then properly determined that the UAW's Strike Assistance Plan payments to laid off employees constituted deductible income.

■ *CONCLUSION*—The Board properly exercised its jurisdiction in deciding the issue of deductible income and properly determined that money received by employees from the Strike Assistance Plan must be deductible from their unemployment compensation benefits.

Claimants' challenge to the Board's conclusion that monies received from the Strike Assistance Plan were deductible income, as defined by I.C. 22–4–5–1 and 22–4–5–2 (Burns Code Edition, 1974), must be resolved against them. Claimants urge that (1) the employer did not timely file notice regarding this disqualifying information, and (2) in any event, the employer failed to sustain the burden of proving that such monies constituted "deductible income."

On August 26, 1974, special referee Morris mailed his decision regarding the labor dispute section of the act and benefits for claimants at exempt plants. On September 9, 1974, GM sent a letter of protest which indicated that benefits should be considered deductible income. On November 12, 1974, a hearing was held on the issue of deductible income and at that time claimants, citing regulation 802 of the Employment Security Act, asserted that the issue was not timely raised. Regulation 802 reads as follows:

OTHER DISQUALIFYING INFORMATION—An employing unit, including an employer, having knowledge of any facts which may affect an individual's eligibility or right to waiting period credit or benefits or facts which might affect the determination of whether the applicant's leaving work was without good cause in connection with the work, shall notify the division claim-holding office of such facts within ten days after the division has mailed or otherwise delivered to him a notice of benefit liability or notice of the filing of such individual's initial claim or additional claim. Unless such facts are submitted within the prescribed time, the division may proceed to determine the validity of the claim in question upon the best information available and, for the purpose of the initial determination, it shall be conclusive with respect to any data which should otherwise have been submitted, and benefits paid and charged to the employer's experience or reimbursable account on the basis of such initial determination, in the absence of fraud, shall be deemed benefits properly paid and properly charged.

When both the notice of the filing of an initial claim and the notice of benefit liability are mailed to an employer, the ten day period during which he may furnish an eligibility information report or other disqualifying information or facts which might affect the determination shall run from the date the first of such notices was mailed.

In response, GM submits that the hearing which took place December 6, 1971 through January 7, 1972, was specifically limited by the parties to the single issue of labor dispute disqualification under Section 1504 of the Act. Secondly, GM argues that the ten

ment benefits is unenforceable. *See, e. g., Lynch Corp. v. Review Board*, (1968) 141 Ind. App. 694, 232 N.E.2d 619, where the governing contract permitted a plant shutdown for a vacation period of two weeks. The court determined that the contract precluded employees from collecting unemployment benefits for that period.

In any event, we do not read the agreement in the instant case to have "waived" any of the employees' rights regarding unemployment benefits. Rather, said agreement appears simply to restate the applicable case law that normal operations must be resumed as promptly as is reasonably possible under the circumstances.

day time limit applies only to information which an employer knows or should have known at the time of the claimants' initial claim. GM explicitly denied any such knowledge in its September 9th letter:

> The facts regarding the receipt of strike benefits by the individual claimant are not, of course, within the control of the employer. Presumably they are within the possession of the claimants who received such payments and the union which paid them. Although this matter was not within the issues before the referee, some documents relevant to it were received in evidence at the referee hearing. Copies of relevant exhibits are enclosed herewith. These documents make a clear *prima facie* showing that the strike benefits were paid to the claimants during the period in question, under the circumstances plainly requiring that such payments be deducted from any unemployment compensation to be awarded.

Transcript, Volume E–5, Exhibit 2. While Beach Hall, a member of Delco-Remy's labor relations staff, testified that he knew of the union strike benefits payments from the media as well as from union distributed information, he did not indicate when he acquired this knowledge. Referee Harbit overruled claimants' procedural objection as follows:

> The employer's request for a hearing on the issue of deductibility of income is ruled timely. Chapter 17–2 and Regulation 802 do not attempt to limit the employer's right to request a hearing on matters which are not determinable at the time of the employee's separation or at the time the employer is notified of the filing of the claim. The ten day limitation on the employer's right to make separation an issue and furnish disqualifying information affecting the initial claim encompassed only matters which exist at the time of which the employer has personal knowledge or which is within its control. The matter of deductible income is not waived or barred by the lapse of time period. No attempt was made by the special referee to rule on the deductibility of income and properly so, since the

matter was only referred on the question of eligibility for benefits under the labor dispute section of the Act.

We hold that the Board's conclusion was a reasonable one in light of the evidence. We cannot find error in its conclusion that, because GM was unaware of the strike benefits and unable to raise the issue of deductible income at the initial hearing, the matter of deductible income was properly before the referee at the November 12, 1974 hearing.

Claimants next assert that if the issue of deductible income was properly preserved, nevertheless, the strike assistance payments were loans and did not fall within the scope of "deductible income." The receipt and amount of such payments are not in dispute here. The only issue is whether the payments constitute deductible income as defined by I.C. 22–4–5–1 and I.C. 22–4–5–2.

In pertinent part the relevant statute defines deductible income to include but not be limited to "remuneration for services from employing units, ... earnings from self-employment; bonuses, gifts or prizes awarded to an employee by an employing unit; [and] payments in lieu of compensation for services...." "Remuneration" and "employing unit" are also statutorily defined:

> "Remuneration," ... means all compensation for personal services, including, but not limited to, commissions, bonuses, dismissal pay, vacation pay, sick pay ..., payments in lieu of compensation for services, and cash value of all compensation paid in any medium other than cash."

I.C. 22–4–4–1.

> "Employing unit" means any individual or type of organization which ... has had one or more individuals performing services for it within the state, for remuneration or under any contract of hire, written or oral, express or implied.

I.C. 22–4–6–1.

While the problem appears to be one of first impression in Indiana, several other jurisdictions have considered whether or not

Strike Assistance Benefits constitute wages. We have reviewed those cases to aid us in our determination here.

Some jurisdictions have analogized strike benefits to insurance or savings plans since payments are made from a fund to which all union members contribute. *Worchester Telegram Publishing Company v. Director of Division of Employment Security*, (1964) 347 Mass. 505, 198 N.E.2d 892; *Capra v. Carpenter Paper Company*, (1960) 258 Minn. 456, 104 N.W.2d 532. The Supreme Judicial Court of Massachusetts stated that the recipients' services are a mere *condition* of receiving benefits but such condition does not constitute an employment or remuneration for services. *Worchester, supra*, 198 N.E.2d at 898. Similarly, it has been said that the assigned strike duties are indicative of union discipline rather than services rendered for which wages are payable. *Radice v. Department of Labor and Industry*, (1949) 4 N.J.Super. 364, 368, 67 A.2d 313, 315. Further, in *Radice, supra*, the court noted that the construction of a statute which dissociates strike benefits from wages is consonant with the broad remedial objectives of the unemployment compensation statute. In each of the aforementioned cases, the receipt of strike benefits was held not to render the recipient ineligible for unemployment benefits.

On the other hand, at least two jurisdictions have implied that if assigned duties were truly proven to be tied to receipt of benefits, the result might be different. For example, in *Kentucky Unemployment Insurance Commission v. Louisville Builders Supply Company*, (Ky.1961) 351 S.W.2d 157, the appellant urged that since strike benefits are considered income for tax purposes, so too should they be deemed wages for unemployment compensation purposes. The court rejected the contention solely because the evidence did not establish that such monies were conditioned upon working the picket line. A similar overtone was present in a recent New Hampshire case. There the court commented:

The Department maintains, however, that the union is the plaintiffs' "employing unit." It takes the position that in order to receive these payments from the union funds the plaintiffs were required to picket and remain available for picketing and to forebear from working for National Gypsum. The evidence reveals the same receipt is used in the case of a strike or of a lockout. In this case the evidence is uncontradicted that the company plant was never picketed and that the plaintiffs, instead of agreeing to forebear from working for National Gypsum, had agreed to work for it on a day-to-day basis under the terms of the old contract. The president of the local union testified that the union required nothing from its members in exchange for the benefits received by these plaintiffs. Finally, Article 13 of the union constitution and by-laws sets out the conditions of eligibility to receive strike and lockout payments. Section 2 provides that a strike donation shall not be paid to any member who refuses to do the duty assigned to him by those in charge of the strike. No such condition is attached to the receipt of lockout payments. We hold that the trial court properly held that the lockout payments were not "wages" but received from an "employing unit" within the provisions of RSA 282:1–0 and were not deductible from unemployment benefits otherwise due the plaintiffs. (Citations omitted).

*McIntire v. State*, (1976) 116 N.H. 361, 366–67, 359 A.2d 619, 622–23.

Finally, New York has explicitly upheld its unemployment agency's denial of state benefits to unemployed claimants who received $162 per week in strike benefits from their union. The Board determined that such claimants were not "totally unemployed." Union members, in order to qualify for benefits, had to report daily to a union officer and to accept tours of duty on the picket line. The court rejected the notion that benefits received were simply returns of weekly contributions made by union members to the strike fund since the amounts paid to strikers were fixed by the union and bore no relationship to the weekly contributions. *Cohen v. Levine*, (1976) 52 App.Div.2d 997, 383 N.Y.S.2d 447.

In this case, the evidence regarding strike benefits was as follows: Joe Warner, chairman of the supplemental unemployment benefits committee of UAW Local 292, testified that each union member laid off before September 24 was required to perform specific strike related duties such as picketing, tending to the kitchen, hauling firewood and attending local educational programs. In order to be eligible for strike benefits, a member was required to participate in strike activity assigned by the local union. In addition, the recipient was obligated to sign up for unemployment compensation and upon receipt of unemployment benefits to reimburse the union fund. Each recipient of money signed the following statement:

I hereby promise that upon receipt of state unemployment compensation benefits for any period during which I received assistance pending settlement of my unemployment compensation claim, I shall refund to local union No. __ an amount equal to that which I received in the form of assistance during such period.

TR. Volume E–5, Exhibit 7.

■ It is well settled that an agency's interpretation of a statute which it is charged to enforce is entitled to considerable deference by the courts. *Indiana Civil Rights Commission v. Sutherland Lumber Company*, (1979) Ind.App., 394 N.E.2d 949. There was substantial evidence from which one could conclude that the claimants here received compensation from the union for performing certain strike related services. In addition, the plain language of the statute classifies any organization which has individuals performing services for it to be an employing unit. We recognize the right of any worker to strike and we appreciate the vital role the Union Assistance Plan plays in effectuating a meaningful right to strike. That is not to say, however, that the Unemployment Security Act permits the use of state funds to replenish such assistance plans. It has been recognized that

the act should be liberally construed to give effect to its beneficent, humane and sound economic policy. However, this liberality does not permit the giving of its benefits to those whom the legislature has positively determined should not have such benefits. Such construction on our part would be judicial legislation which might nullify its purposes.

*Blakely v. Review Board of Indiana Employment Security Division*, (1950) 120 Ind. App. 257, 90 N.E.2d 353, 357.

Because it is the positive mandate of the legislature that the beneficent and humane objectives of the act shall not be used to penalize or subsidize either the employer or the employee who is engaged in a labor dispute, *id.* 90 N.E.2d 362, we cannot say that the Review Board's application of the facts to the statute in question was clearly erroneous. Such an interpretation is consistent with both the plain language of the statute and the underlying policy of state neutrality in labor disputes.

That neutrality as articulated in *Blakely, supra,* causes us to affirm the Board's decision in all respects except insofar as it grants unemployment compensation benefits to employees at "exempt" plants.

The Board's decision is affirmed as to issues two and three and is reversed and remanded to the Board with directions to change its decision consistent with this opinion as to issue one.

SHIELDS, J., concurs.

SULLIVAN, J., dissents in part and concurs in part with opinion.

SULLIVAN, Judge, dissenting in part and concurring in part:

### I.

The relevant statute reads in part as follows:

"An individual shall be ineligible for waiting period or benefit rights: for any week with respect to which ... his total or partial or part total unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he was last employed."

I.C. 22–4–15–3 (Burns Code Ed. 1974). The statutory elements for disqualification are thus fourfold. There must be 1) a stoppage of work 2) because of 3) a labor dispute 4) at the factory, establishment or other premises where they were last employed.

The significant facts are not contested. Rather, the controversy centers on the legal conclusion to be drawn from the findings of fact. The scope of appellate review of a question of law in administrative decisions was discussed in *Gold Bond Building Products Division National Gypsum Co. v. Review Board* (2d Dist. 1976) 169 Ind.App. 478, 349 N.E.2d 258. When reviewing such legal questions, we examine the relationship between the basic findings of fact and the agency's conclusions to determine if the deduction is reasonable and based on substantial evidence. *See also City of Evansville v. Southern Indiana Gas & Electric Co.* (1975), 167 Ind.App. 472, 339 N.E.2d 562.

General Motors argues that the evidence proved and the Review Board found, the existence of each of the four statutory elements for disqualification and yet did not disqualify the claimants because of an erroneous reliance on a "fault" standard. The Review Board counters that there was no labor dispute *at* the exempt plants and that even if there were, a denial of benefits is appropriate only if the labor dispute and resultant curtailment in work is the *fault* of the claimants.

We must then examine the facts and determine whether there is substantial evidence to support the Review Board's conclusion that the work curtailment was not due to a labor dispute *at* the exempt plant.

The Board focuses on the definition of "establishment" and urges that while, admittedly, there was a labor dispute, that dispute did not exist *at* each exempt plant since GM cannot be considered to constitute one establishment. GM concedes for the purposes of this appeal that it is *not* one large establishment. GM's argument is instead based on the idea that each plant could be treated as a separate establishment and nevertheless a disqualifying labor dispute still existed at *each* establishment.

The term "labor dispute" has been defined to include any controversy concerning terms and conditions of employment. *Adkins v. Indiana Employment Security Division* (1946), 117 Ind.App. 132, 70 N.E.2d 31. GM asserts that because UAW was negotiating changes in the National Agreement which governed the terms and conditions of employment of all employees at all locations including the exempt plants, a labor dispute necessarily existed at each plant.

Few precedential cases have examined the scope of the term "labor dispute" and its application to cases of international unions. In *Artim Transportation System v. Review Board* (1971), 149 Ind.App. 137, 271 N.E.2d 494, the evidence established that a labor dispute existed at a truck terminal which was a member of a multi-member employee bargaining unit. The dispute involves an agreement between the bargaining unit and *all* members of the association. However, that evidence did not affirmatively establish a labor dispute at the appellant's truck terminal. The court rejected the idea that a strike of one member of a multiemployer-union bargaining group constituted a strike of all but remarked:

"It is arguable that to reach a different conclusion in the instant case would better serve the declared public policy of this state to remain neutral in labor management relations. However, to reach a different result would be to violate the clear and unambiguous language of the statute as it presently reads. If the public of the state would be better served by amending the statute to encompass modern labor and management practices not contemplated when the statute was initially enacted, then the responsibility lies with the Legislature and not with the courts to so change the statute." 271 N.E.2d at 499.

Previously and similarly, in *General Motors Corp. v. Review Board* (1970), 146 Ind. App. 278, 255 N.E.2d 107, the court did not find a labor dispute at each individual plant. In that case, collective bargaining was involved between UAW and GM on behalf of all GM employees. UAW called a strike at various GM plants after the entire

membership so voted and instructed some plants to continue working. Four Indiana plants were· among those instructed *not* to strike. Because the four Indiana plants were not on strike and because there was no evidence that curtailment of production was being used as a tool by either labor or management in negotiations at the four plants, the Review Board concluded that there was no labor dispute at the four factories and that lay-offs there were due to the unavailability of work. The court affirmed the Board's award of benefits. In a concurring opinion it was noted:

"... [A]ppellant injected a public policy consideration deserving of comment here. Appellant argues that state funds in the form of compensation benefits should not be made available to unions in such a manner as to constitute a subsidy to selective strike activity such as here conducted. In this connection, it was the substance of appellees' argument that even if the union did, in fact, utilize the 'selective strike' method for maximum *negotiating leverage upon the entire General Motors operation* and even if the union did so with the knowledge and expectation that certain non-striking employees, arbitrarily selected by the union, as here, could draw financial assistance in the form of unemployment benefits, thereby decreasing the adverse effect of the labor dispute upon such employees, such does not alter the fact that union conduct of this sort is not statutory cause for benefit ineligibility. Appellees stated that if the labor strategy of this sort is deemed an evil it is for the legislature to so declare and to remedy that evil by statutory amendment. While I recognize the very real public policy consideration in this respect I tend strongly to agree with appellees...." 255 N.E.2d at 117.

While I find GM's argument to be appealing, the adoption of that position by the majority is improper. I cannot accept the proposition that a nationwide labor dispute imbues each plant with the aura of a labor dispute within the meaning of I.C. 22–4–15–3. The legislature's choice of the circumscribed language "a labor dispute at the factory, establishment or other premises ...." indicates an intent to confine disqualification of benefits to labor disputes which actually exist at each individual plant. Thus, I am compelled to the conclusion that although the allowance of such benefits in cases of selective striking may be contrary to our conception of public policy, we can neither judicially legislate nor implement what we perceive to be in the public interest in the absence of statutory prescription.

The majority bootstraps itself into the obtained result by torturing the clear language of the statute. It concluded that the General Assembly contemplated disqualification of all employees of an employer having an integrated, interdependent business operation. Such conclusion is apparently premised upon the use of the words "factory, establishment, or other premises" in the disjunctive. The opinion by Chief Judge Buchanan necessarily implies that a strike at a factory disqualifies an employee at a separate, distinct and geographically removed "establishment or other premises" so long as there is a work stoppage at the latter place. Such implication may well constitute good public policy but as earlier noted, it is not warranted by the clear and unmistakable language of the statute. It is not sufficient that there is a work stoppage at the location in question; the labor dispute must exist at that location as well. And it is not enough that, as the majority holds, the labor dispute effects, touches or concerns that location. *Artim Transportation System v. Review Board, supra,* 271 N.E.2d 494; *General Motors Corp. v. Review Board, supra,* 255 N.E.2d 107. The majority opinion with regard to this issue clearly overrules the two cases last cited and usurps the prerogative of the Indiana General Assembly. While I sympathize with the desire of my colleagues to enunciate a more palatable policy, I am unable to join them because we were elected to serve in the judicial, not the legislative branch of government.

In the instant case the Board's conclusion that the curtailed production was not due to a labor dispute at the exempt plants should have been upheld.

## II.

With respect to eligibility for benefits between the end of the strike and resumption of normal business operations, GM argues that if claimants were originally disqualified they continue to be disqualified, but concedes that if claimants at the exempt plants were not disqualified from receipt of unemployment benefits under the labor dispute section, then they did not become so disqualified at the end of the strike during resumption of normal operations at those plants.

Since I would hold that claimants at exempt plants were not disqualified under the labor dispute section of the Act, they need not show they have become qualified. Employees at exempt plants should then be awarded benefits during the start-up period as well as the strike period.

I concur, however, in the majority's determination that benefits during the start-up period were properly denied employees at the struck plants.

## III.

I concur in the majority opinion concerning Issue III.