**CATERPILLAR FINANCIAL SERVICES CORPORATION, Petitioner**

v.

**INDIANA DEPARTMENT OF STATE REVENUE, Respondent.**

No. 49T10–0311–TA–54.

Tax Court of Indiana.

Sept. 12, 2005.

Publication Ordered June 6, 2006.

Timothy J. Eifler, Walter L. Sales, Ogden Newell & Welch, PLLC, Louisville, KY, for Petitioner.

Steve Carter, Attorney General of Indiana, John D. Snethen, Deputy Attorney General, Amber Merlau St.Amour, Deputy Attorney General, Indianapolis, for Respondent.

### ORDER ON PETITIONER'S MOTION FOR SUMMARY JUDGMENT

FISHER, J.

Caterpillar Financial Services Corporation (CAT) challenges the final determination of the Indiana Department of State Revenue (Department) holding that, for the 1996 and 1997 tax years (the years at issue), CAT was not subject to Indiana's Financial Institutions Tax (FIT) but was, instead, subject to Indiana's Gross Income Tax (GIT), Adjusted Gross Income Tax (AGIT), and Supplemental Net Income Tax (SNIT) (collectively, corporate income taxes). The matter is currently before the Court on CAT's motion for summary judgment. While CAT raises several issues in its motion, one issue is dispositive: whether, during the years at issue, CAT was subject to the FIT.[1]

---

1. Specifically, CAT argues that because it was subject to the FIT during the years at issue, it was not subject to the corporate income taxes. *See* IND. CODE ANN. § 6–5.5–9–4 (West 1996) (stating that a taxpayer who is subject to the FIT is exempt from Indiana's corporate income taxes.) If it is determined that CAT was subject to the corporate income taxes during the years at issue, then CAT argues, in the alternative, that the Department's calculation of those taxes due is erroneous. (*See* Pet'r Br. In Supp. of Its Mot. for Summ. J. (hereinafter Pet'r Br.) at 2–3.)

## FACTS

The parties have stipulated to the following facts. CAT is a Delaware corporation domiciled in Tennessee. CAT is a wholly-owned subsidiary of Caterpillar, Inc. (Caterpillar), a Delaware corporation domiciled in Illinois. While Caterpillar and most of its subsidiaries are engaged in the manufacture and sale of heavy equipment (including construction and agricultural machinery, engines, and related equipment), CAT is primarily engaged in making loans and otherwise extending credit, through a variety of financing arrangements, to the worldwide customers of Caterpillar, as well as to Caterpillar's subsidiaries, local dealerships, and distributors.

One of the primary financing arrangements CAT offers is the "finance lease/conditional sale contract" (finance lease). In a typical finance lease, CAT purchases a piece of equipment from a Caterpillar dealer and simultaneously sells it to a customer via the finance lease agreement. Pursuant to the lease agreement, while possession of the equipment is transferred directly from the Caterpillar dealer to the customer, CAT maintains legal title to the equipment. The lease agreement requires the customer to make monthly (or other periodic) rental payments to CAT and, at the end of the term of the lease, grants the customer the option to purchase the equipment. The option price in a finance lease is nominal in relation to the fair market value of the equipment at the end of the lease term.

For federal income tax purposes, CAT's finance leases are considered the economic equivalent to the extension of credit and are, therefore, treated as loans (and not as "true" leases). (*See* Jt. Stip. of Facts at 10–15, ¶¶ 27.2, 27.6, 28.2, 28.6 and Ex. 15, p. 3.) Consequently, for federal income tax purposes, CAT reports its gross income from its finance leases as: 1) the gross income from the "deemed sale" of equipment by CAT to its customers and 2) the gross income from the subsequent loan arrangements thereon. (*See* Jt. Stip. of Facts at 10–11, ¶¶ 27.2–27.5.) (*See also* Pet'r Br. In Supp. Of Its Mot. for Summ. J. (hereinafter Pet'r Br.) at 12, 16.) Thus,

> [w]ith the exception of the first year of a finance lease/conditional sale, CAT'[s] annual [federal] gross income from finance leases/conditional sales consists of interest income. CAT [ ] reports that portion of the annual rental payments which are treated as interest for [federal income t]ax purposes on . . . its federal income tax return.

In the year the finance lease/conditional sale contract is executed, CAT [ ] records and reports for [federal income t]ax purposes the gross income related to the deemed sale of the equipment under the finance lease/conditional sale contract. CAT [ ] records 100% of the price at which equipment is deemed sold as gross sales [income.][2] In 1996 and 1997, [however,] CAT [ ] [also] recorded 100% of the price at which the equipment was purchased by CAT [ ] from the Caterpillar dealer as costs of goods sold[.] Because CAT [ ] is financing the customer's purchase of the equipment, the price at which CAT [ ] is deemed to sell the equipment to the customer is the same price at which CAT [ ] purchases the equipment from the dealer. Deducting the cost of the equipment [ ] from the gross sales price [ ], CAT [ ] recorded $0.00 gross profit on [ ] its federal

**2.** "The deemed sale price is the face amount of the finance lease, being the portion of the total required rental payments under the lease deemed to be return of capital plus the option price." (Pet'r Br. at 16 (citation omitted).)

income tax return in the year the finance lease [ ] was executed.[3]

(Jt. Stip. of Facts at 10–11, ¶¶ 27.3, 27.4 (footnotes added).) (*See also* Pet'r Br. at 16.)

## PROCEDURAL HISTORY

For each of the years at issue, CAT, believing it was subject to the FIT, filed a financial institution franchise tax return (FIT–20) with the Department. In January of 2000, the Department, after completing an audit of CAT, determined that CAT did not qualify as a FIT taxpayer. Consequently, the Department reclassified CAT as a corporate income tax filer and issued proposed assessments of the GIT, AGIT, and SNIT, including interest thereon (net of the FIT previously paid by CAT).

CAT timely protested the Department's proposed assessments. On October 20, 2000, after conducting a hearing on the matter, the Department issued a letter of findings in which it denied CAT's protest. CAT sought, and was granted, a rehearing with the Department. In a supplemental letter of findings issued on May 18, 2001 (Supplemental LOF), the Department again denied CAT's protest.

CAT subsequently requested, and received, yet another rehearing with the Department. On June 29, 2001, the Department issued a Second Supplemental Letter of Findings (2nd Supplemental LOF) in which it again denied CAT's protest. In the interim, however, CAT paid the corporate income tax liability (and interest

thereon) as determined by the Department's audit.

On November 19, 2002, CAT requested a ruling from the Department's Tax Policy Division as to how to calculate gross income from its finance leases for purposes of determining whether it qualified as a FIT taxpayer. On February 3, 2003, after receiving a response, CAT requested a clarification from the Department. In a letter dated May 16, 2003 (Letter of Clarification), the Department responded:

> Gross income may be determined in one of two different methods:
>
> 1. [G]ross income would be the total gross sales price booked plus any accrued finance charges *without any deduction for cost of goods sold.* Under this method the gross income, from the sale/lease, would only be claimed in the year it is reported for federal tax purposes.... Thereafter only the interest received or accrued on that contract would be included[.]
>
> 2. [A] taxpayer could [also] use the gross income actually received or accrued on an annual basis plus interest received or accrued on each outstanding conditional sale/finance lease for each tax year *with no deduction for cost of goods sold* or cost of money.

Since the "gross income" in question is used only in [determining whether a taxpayer qualifies to pay the FIT], it is not material as to which method would be used as long as only one method is used on a consistent basis.

---

**3.** A variation of CAT's finance lease is the "municipal finance lease." While the transaction is essentially the same as the finance lease, the customer is a non-federal governmental entity such as a city, county, state government, public authority, school, park, or water conservation district. (Jt. Stip. of Facts at 12, ¶ 28.) In the first year of a municipal finance lease, CAT's gross income, for federal

tax purposes, is calculated in the same way its gross income is calculated in a typical finance lease. (*See* Jt. Stip. of Facts at 10–11, 13–14, ¶¶ 27.4, 28.4.) In the remaining years of a municipal finance lease, while CAT's gross income consists solely of interest income, it is not required to report that income for federal income tax purposes. (*See* Jt. Stip. of Facts at 13, ¶ 28.3.)

(Jt. Stip. of Facts at 4–5, ¶ 18 (emphases added).)

On July 7, 2003, CAT re-filed its original FIT returns for the years at issue, explaining that pursuant to the first method as described in the Department's Letter of Clarification, it did indeed qualify as a FIT taxpayer. As a result, CAT also filed amended corporate income tax returns (IT20–X) for each of the years at issue, claiming refunds of the corporate income taxes it previously paid.

On October 29, 2003, the Department issued a letter to CAT indicating that its Letter of Clarification was in error. More specifically, the Department explained that in calculating "gross income" for purposes of determining whether it qualified as a FIT taxpayer, CAT *was* required to subtract the cost of goods sold from the total gross sales price. (*See* Jt. Stip. of Facts at Ex. 23.) As a result, the Department asserted that CAT did not qualify as a FIT taxpayer. The Department subsequently denied CAT's claims for refund.

CAT initiated this original tax appeal on November 19, 2003. On September 15, 2004, CAT filed a motion for summary judgment. The Court conducted a hearing on CAT's motion on March 31, 2005. Additional facts will be supplied as necessary.

## STANDARD OF REVIEW

This Court reviews the Department's final determinations *de novo*. IND. CODE ANN. § 6–8.1–5–1(h) (West Supp.2004–2005) (*de novo* review of proposed assessments); IND. CODE ANN. § 6–8.1–9–1(d) (West Supp.2004–2005) (*de novo* review of denials of claims for refund). Accordingly, the Court is bound by neither the evidence nor the issues presented at the administrative level. *See Williams v. Indiana Dep't of State Revenue,* 742 N.E.2d 562, 563 (Ind. Tax Ct.2001). Summary judgment is appropriate only where no genuine issues

of material fact exist and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Williams,* 742 N.E.2d at 563.

## DISCUSSION AND ANALYSIS

Indiana's FIT, codified at Indiana Code § 6–5.5–1–1 through 6–5.5–9–5, is an excise tax on "the corporate privilege of transacting the business of a financial institution in Indiana." IND. CODE ANN. § 6–5.5–2–1(a) (West Supp.2004–2005). The FIT "is intended to tax *both* traditional financial institutions (such as banks and savings and loans, etc.), that are transacting business within Indiana, as well as other types of businesses that are *deemed* to be transacting the business of a financial institution in Indiana." IND. ADMIN. CODE tit. 45, r. 17–2–1 (1996) (emphases added). As a result, while the FIT is traditionally imposed on holding companies, regulated financial corporations, and subsidiaries of holding companies or regulated financial corporations, it is also imposed on "[a]ny other corporation organized under the laws of the United States, this state, another taxing jurisdiction, or a foreign government that is carrying on the business of a financial institution" in Indiana. *See* IND. CODE ANN. § 6–5.5–1–17(a)(1)–(4) (West 1996). Pursuant to Indiana Code § 6–5.5–1–17(d)(2), a corporation will be deemed to be "carrying on the business of a financial institution" if

eighty percent (80%) or more of [its] gross income, excluding extraordinary income, is derived from one (1) or more of the following activities:

(A) Making, acquiring, selling, or servicing loans or extensions of credit. For the purpose of this subdivision, loans and extensions of credit include:

(i) secured or unsecured consumer loans;

(ii) installment obligations;

(iii) mortgage or other secured loans on real estate or tangible personal property;

(iv) credit card loans;

(v) secured and unsecured commercial loans of any type;

(vi) letters of credit and acceptance of drafts;

(vii) loans arising in factoring; and

(viii) any other transactions with a comparable economic effect.

(B) Leasing or acting as an agent, broker, or advisor in connection with leasing real and personal property that is the economic equivalent of the extension of credit if the transaction is not treated as a lease for federal income tax purposes.

(C) Operating a credit card, debit card, charge card, or similar business. *As used in this subdivision, "gross income" includes income from interest, fees, penalties, a market discount or other type of discount, rental income, the gain on a sale of intangible or other property evidencing a loan or extension of credit, and dividends or other income received as a means of furthering the activities set out in this subdivision.*

A.I.C. § 6–5.5–1–17(d)(2) (emphasis added).

During the years at issue, the FIT was imposed at the rate of 8.5% against the remainder of a taxpayer's adjusted gross income or apportioned income minus its deductible Indiana net operating losses, net capital losses, and net capital gains,

multiplied by an apportionment percentage. *See* A.I.C. § 6–5.5–2–1(a) (West 1996) (amended 2000, eff. 1–1–99). Calculation of a taxpayer's FIT liability was, therefore, based in part upon the taxpayer's calculation of federal adjusted gross income tax liability. Indeed, for purposes of the FIT, adjusted gross income meant "taxable income as defined in Section 63 of the Internal Revenue Code [26 U.S.C. § 63 [4]]," with certain adjustments. IND. CODE ANN. § 6–5.5–1–2 (West 1996). *See also Salin Bancshares, Inc. v. Indiana Dep't of Revenue,* 744 N.E.2d 588, 591 (Ind. Tax Ct.2000). In turn, it can be said that a taxpayer's FIT liability was, *ultimately,* based upon its calculation of gross income for federal income tax purposes. *See* 26 U.S.C. § 61 (1996) (defining gross income for federal income tax purposes); 26 U.S.C. § 63 (1996) (defining taxable income as "gross income minus the deductions allowed by this chapter"). *See also* IND. CODE ANN. § 6–5.5–1–10 (West 1996) (stating that for purposes of the FIT, " 'gross income' means gross income (as defined in Section 61 of the Internal Revenue Code) [5] for federal income tax purposes") (footnote added).

The issue before the Court is whether, during the years at issue, CAT was subject to the FIT.[6] The parties agree that the issue's resolution is dependent on the answer to a more specific question: how is CAT to calculate the "gross income" from its finance leases under Indiana Code § 6–5.5–1–17(d)(2)? [7] The Court summarizes [8] the parties' arguments as follows.

**4.** The Internal Revenue Code (IRC) is generated from the official version of the U.S.Code.

**5.** Section 61 of the Internal Revenue Code defines gross income as "all income from whatever source derived." 26 U.S.C. § 61(a) (1996). The section then lists, for purposes of illustration, some of the more common items of gross income, including: gross income de-

rived from business; interest; and rents. *See id.*

**6.** The Court notes that for purposes of this case, neither party disputes that CAT was "doing business in Indiana."

**7.** Aside from the income CAT earns from its finance leases, CAT also earns income from other: 1) loans; 2) installment sale contracts;

The Department claims that, pursuant to Indiana Code § 6–5.5–1–10, calculating gross income for purposes of Indiana Code § 6–5.5–1–17(d)(2) is no different than calculating gross income for federal income tax purposes. (*See* Resp't Resp. to Pet'r Mot. for Summ. J. (hereinafter Resp't Resp.) at 21–23.) Consequently, the Department maintains that the gross income from CAT's finance leases for purposes of determining whether it qualifies as a FIT taxpayer under Indiana Code § 6–5.5–1–17(d)(2) is the same gross income it reported on its federal income tax returns: 1) income from the deemed sale of equipment (i.e., total sales, less the cost of goods sold), and 2) interest income. (*See* Resp't Resp. at 25–26.) In turn, the Department argues that the gross income from CAT's finance leases is limited to interest income only, as CAT's federal income tax returns indicate that its gross income from the deemed sales of equipment was zero. (*See* Resp't Resp. at 23, 25, 37.) (*See also* Jt. Stip. of Facts at 10–11, ¶ 27.4.) Given this calculation of gross income, the Department explains that CAT falls short of the 80% benchmark as required by Indiana Code § 6–5.5–1–17(d)(2) and therefore does not qualify as a FIT taxpayer.

CAT argues, on the other hand, that for purposes of qualifying as a FIT taxpayer under Indiana Code § 6–5.5–1–17(d)(2), the Department has ignored the fact that that statute contains its own definition of "gross income." Under this definition of "gross income," CAT explains that while its finance leases are treated as loans for federal income tax purposes, for purposes of determining whether it qualifies as a FIT taxpayer, the finance leases are to be treated as leases:

[Indiana Code § 6–5.5–1–17(d)(2) ] does not define a financing lease as a loan. The statute says leasing that is the equivalent of a loan for federal income tax purposes, but it defines it as a lease [because] the flush language [i.e., the items listed in the last clause of Indiana Code § 6–5.5–1–17(d)(2) ] says, "[g]ross income includes rental income." So ... a lease that is the equivalent of a loan for federal income tax purposes, once you have that category of a transaction, you then go to the flush language, and it says, "[g]ross income includes rental income from that type of transaction." So it's not a ... a loan ... [f]or purposes of this statute, it's a lease and you're getting rental income.[9]

---

3) long term operating leases; 4) wholesale financing transactions; 5) insurance financing transactions; 6) securitizing and servicing current loans; 7) late charges and document fees; 8) loans to affiliated companies; and 9) dividends from subsidiaries engaged in financing. (*See* Pet'r Br. at 9–10.) Both parties agree that CAT's income from these transactions (except for the income earned from its operating leases) may be used to satisfy the "80% test" of Indiana Code § 6–5.5–1–17(d)(2). (*See* Pet'r Br. at 10–15 (citing to Jt. Stip. of Facts).) Presently, the parties' only dispute is how to calculate CAT's "gross income" from the finance leases.

8. CAT filed a 74–page written brief, as well as a 42–page reply brief, in this case. The Department's brief was 40 pages. While the Court appreciates the parties' thoroughness in

presenting their arguments, litigants are reminded to be as concise and succinct as possible. *See, e.g.,* Ind. Appellate Rule 44(D) (Indiana Supreme Court limits initial briefs to a length of 30 pages maximum, and reply briefs to a 15 page maximum).

9. Stated differently: 1) under Indiana Code § 6–5.5–1–17(d)(2), gross income includes rental income; 2) the only activities listed in the statute that would generate rental income are those rental/leasing activities that, for federal income tax purposes, are not treated as leases; 3) therefore, under Indiana Code § 6–5.5–1–17(d)(2), it must mean that those rental/leasing activities that are not treated as leases for federal income tax must be treated as leases for purposes of qualifying as a FIT taxpayer. (*See* Pet'r Br. at 23.)

(Oral Argument Tr. at 12–13 (footnote added).) CAT then explains that because the FIT statutes do not define "rental income," the term must be given its plain and ordinary meaning: gross rental receipts, without any deductions. (*See* Pet'r Br. at 24–25 (citing *Miles v. Dep't of Treasury,* 209 Ind. 172, 199 N.E. 372, 382 (1935); IND. ADMIN. CODE tit. 45, r. 1–1–28 (1996)).) Accordingly, CAT maintains that for purposes of qualifying as a FIT taxpayer under Indiana Code § 6–5.5–1–17(d)(2), the "gross income" from its finance leases is: 1) the face amount of the finance lease upon receipt (*see* fn. 2, *supra* ), plus 2) the interest portion of each rental payment when payment is received. (*See* Pet'r Br. at 24–26.) Given this calculation of gross income, CAT asserts that it does indeed exceed the 80% benchmark as required by Indiana Code § 6–5.5–1–17(d)(2) and therefore qualifies as a FIT taxpayer. (*See* Oral Argument Tr. at 6.)

As evidenced by their respective arguments, the parties' dispute centers around the meaning of the term "gross income" in Indiana Code § 6–5.5–1–17(d)(2). When this Court is confronted with a question of statutory construction, its function is to determine and implement the intent of the legislature in enacting that statutory provision. *See Johnson County Farm Bureau Coop. Ass'n v. Indiana Dep't of State Revenue,* 568 N.E.2d 578, 580 (Ind. Tax Ct.1991), *aff'd by* 585 N.E.2d 1336 (Ind. 1992). In general, the best evidence of this intent is found in the actual language of the statute itself, as chosen by legislature. *See id.* at 581. To this end, the Court will endeavor to give meaning to each and every word used in a statute, as it will not be presumed that the legislature intended to enact a statutory provision that is superfluous, meaningless, or a nullity. *See Chrysler Fin. Co. v. Indiana Dep't of State Revenue,* 761 N.E.2d 909, 916 (Ind. Tax Ct.2002), *review denied; Hori-*zon Bancorp v. Indiana Dep't of State Revenue,* 626 N.E.2d 603, 608 (Ind. Tax Ct.1993), *rev'd in part on other grounds by* 644 N.E.2d 870 (Ind.1994). Additionally, the Court will give statutory words and phrases their plain, ordinary, and usual meaning. *See Johnson County Farm Bureau,* 568 N.E.2d at 581. Finally, the Court must read the statute as a whole, and not sections or parts of it piecemeal. *See State v. Adams,* 583 N.E.2d 799, 800 (Ind.Ct.App.1992), *trans. denied.* Indeed, "[e]ach part [of a statute] must be considered with reference to all other parts [of the statute]." *Id.*

To say, as the Department does, that "gross income" under Indiana Code § 6–5.5–1–17(d)(2) is the same as "gross income" under Indiana Code § 6–5.5–1–10 contravenes these very rules of statutory construction. First and foremost, if "gross income" under Indiana Code § 6–5.5–1–17(d)(2) is the same as "gross income" under Indiana Code § 6–5.5–1–10, then the flush language in § 6–5.5–1–17(d)(2) is superfluous. In other words, the legislature could have saved itself the time and effort in drafting such language because the definition of "gross income" under Indiana Code § 6–5.5–1–10 would have clearly governed. The fact that the legislature did not choose "to leave well enough alone" leads the Court to believe that the flush language of Indiana Code § 6–5.5–1–17(d)(2) has a vitality, or meaning, of its own, independent from Indiana Code § 6–5.5–1–10.

Second, the Department's interpretation of "gross income" under Indiana Code § 6–5.5–1–17(d)(2) cannot be reconciled with the other language used in the statute. Indiana Code § 6–5.5–1–17(d)(2) is made up of two parts: 1) it requires that at least 80% of a corporation's gross income must be derived from three specific types of activities, and 2) it lists certain

types of income that are to be included in "gross income" for purposes of that subdivision. The Department erroneously reads these provisions as being completely unrelated to each other. *Cf. Adams,* 583 N.E.2d at 800 (a statute's provisions must be construed in light of one another). Consequently, Indiana Code § 6–5.5–1–17(d)(2) must be construed as delineating not only the types of activities by which a corporation is deemed to be carrying on the business of a financial institution, but also the types of income earned as a result of those activities. *See* A.I.C. § 6–5.5–1–17(d)(2).

Under Indiana Code § 6–5.5–1–17(d)(2), the only activity that could generate "rental income" is a lease that 1) is the economic equivalent of the extension of credit and 2) is not treated as a lease for federal income tax purposes. *See* A.I.C. § 6–5.5–1–17(d)(2)(B). As alluded to earlier, such leases are, for federal income tax purposes, treated as loans. Loans, however, do not generate rental income. Consequently, if "gross income" under Indiana Code § 6–5.5–1–17(d)(2) were the same as "gross income" for federal income tax purposes (via Indiana Code § 6–5.5–1–10), the term "rental income" would be meaningless.

The legislature is presumed to mean what it says. *Hyatt Corp. v. Dep't of State Revenue,* 695 N.E.2d 1051, 1053 (Ind. Tax Ct.1998), *review denied.* Thus, given the actual language used in Indiana Code § 6–5.5–1–17(d)(2), the Court presumes that the legislature did not intend to equate "gross income," for purposes of determining whether a taxpayer qualifies to pay the

FIT thereunder, with "gross income" under federal income tax principles.[10] *See Caylor–Nickel Clinic, P.C. v. Indiana Dep't of State Revenue,* 569 N.E.2d 765, 769 (Ind. Tax Ct.1991) (footnote added) (stating that "[s]tatutory language is deemed intentionally chosen by the legislature to give effect to the meaning of an act"), *aff'd by* 587 N.E.2d 1311 (Ind.1992).

Nevertheless, the Department advances several arguments as to why it believes such a presumption is erroneous. The Department's first contention is with CAT's claim that "rental income" means gross rental receipts, without any deductions. The Department argues that CAT has "misguidedly" applied the definition of "rental income" from Indiana's Gross Income Tax Act—Indiana Code § 6–2.1 [11]— for purposes of the FIT. In doing so:

> CAT [ ] offers no explanations or cogent reasons to support the importation of concepts and definitions from the repealed Article 2.1(GIT) into Article 5.5(FIT).... Moreover CAT [ ] fails to mention how the repeal of the GIT affects an understanding of these FIT terms.

> [ ]CAT['s] adoption of GIT concepts and definitions ignores the inherent and fundamental differences between the FIT and the GIT.... [I]mporting definitions from other articles of the tax code involves many considerations. For instance, the nature of the two different taxes may need to be taken into account. And the different taxable events may be relevant to the analysis. Additionally, it may be necessary to consider the possi-

---

10. In other words, the term "gross income" for purposes of determining whether a taxpayer qualifies to pay the FIT (Indiana Code § 6–5.5–1–17(d)(2)) is different than the term "gross income" for purposes of calculating a taxpayer's FIT liability (Indiana Code § 6–5.5–1–10).

11. Indiana's Gross Income Tax Act was repealed effective January 1, 2003. *See* 2002 Ind. Acts 192, § 191.

ble unintended consequences of importing definitions from disparate tax statutes.

(Resp't Br. at 31–32 (footnotes omitted).)

"In construing the meaning of certain words contained in a statute, the legislative definition of the same words in another act (although not conclusive) is entitled to consideration in construing the same words when used in another statute upon the same, or related, subject." *Adkins v. Indiana Employment Sec. Div.*, 117 Ind. App. 132, 70 N.E.2d 31, 33 (1946) (citation omitted). Furthermore, statutes in *pari materia* should, if possible, be construed together and harmonized to effectuate the intent of the Legislature. *Rhoade v. Indiana Dep't of State Revenue*, 774 N.E.2d 1044, 1048 (Ind. Tax Ct.2002) (citation omitted).

Under the Gross Income Tax Act, a tax was imposed on the receipt of gross income. *See* IND. CODE ANN. § 6–2.1–2–2 (1996) (repealed 1–1–03). The amount of the tax due was determined by applying a specified tax rate to the amount of gross income a taxpayer received from certain types of business transactions. *See* IND. CODE ANN. § 6–2.1–2–3 (1996) (repealed 1–1–03); IND. CODE ANN. § 6–2.1–2–4 (1996) (repealed 1–1–03); IND. CODE ANN. § 6–2.1–2–5 (1996) (repealed 1–1–03). Under the FIT, a tax is imposed on the privilege of transacting the business of a financial institution in Indiana. *See* A.I.C. § 6–5.5–2–1(a). During the years at issue, the amount of the tax due was determined by applying the specified tax rate against the remainder of a taxpayer's adjusted gross income or apportioned income (minus certain losses, etc.). *See* A.I.C. § 6–5.5–2–1(a). Thus, both of these articles provide for the imposition of taxes on the performance of a particular act. Similarly, both articles measure the perform-

ance of the act, ultimately, by the taxpayer's gross income.

While the FIT statutes do not define "rental income," under the GIT, rental income was understood to mean "gross receipts, without any deductions, derived from the lease or rental of real or tangible personal property, whether actually or constructively received[.]" IND. ADMIN. CODE tit. 45, r. 1–1–28 (1996). Furthermore, prior to the enactment of the FIT in 1990, financial institutions were taxable under the GIT, or Article 2.1. Therefore, the definition of rental income as it relates to the FIT should be construed in harmony with Article 2.1 because the two articles are *in pari materia*. *See also UACC Midwest, Inc. v. Indiana Dep't of State Revenue*, 667 N.E.2d 232, 237 (Ind. Tax Ct.1996) (stating that where the Legislature has not defined a term within a specific article of the tax code, the Court may consider a statutory definition of the term as it is used in another article of the tax code).

Given the fact that the construction of the term "rental income" for purposes of the FIT rests in CAT's favor, the proverbial ball has landed in the Department's court. Thus, it was up to the Department, and not CAT, to rebut the construction. In other words, it was up to the Department "to offer an explanation or cogent reasons to refute the importation of concepts and definitions from the repealed Article 2.1 into Article 5.5." Likewise, it was up to the Department to discuss "how the repeal of the GIT affected an understanding of 'rental income' under the FIT." Instead of offering these explanations or discussions, the Department merely points its finger at CAT and says "you should have; you could have." As a result, the Department has failed to return the proverbial volley.

The Department's second contention is based on the theory that if "gross income" under Indiana Code § 6–5.5–1–17(d)(2) is not the same as "gross income" for federal income tax purposes, then the numerator of the FIT fraction will be grossly inflated. More specifically:

I.R.C. § 61 "gross income" includes *all income*. And the flush language of Ind[iana] Code § 6–5.5–1–17(d)(2) includes sources of [ ]*income* received from transacting "the business of a financial institution." Consequently, the latter definition of "income" must include income covered by the former definition of "gross income."

\* \* \* \*

Because the denominator of the FIT [f]raction equals a corporation's I.R.C. § 61 gross income, the numerator must necessarily equal a subset of I.R.C. § 61 gross income. Under the dual [definition] of "gross income" [ ] advocated by [CAT], however, the numerator of the FIT [f]raction would not be a[n] income subset of the denominator; instead, it would be a completely different set of income unrelated to the income represented by the denominator. In other words, the law says that the FIT denominator is a bushel of apples—but CAT wants to put oranges in the numerator. Under [CAT]'s theory, it is unclear what t[he] FIT actually measures.

(Resp't Br. at 28–29 (emphases in original).) The Department misses the point.

As explained earlier, "gross income" under Indiana Code § 6–5.5–1–17(d)(2) is not the same as federal gross income. Thus, the Department's suggestion that the denominator of the FIT fraction is a corporation's I.R.C. § 61 gross income is erroneous: the concept of "gross income" under Indiana Code § 6–5.5–1–17(d)(2)—whether as used in the numerator of the FIT frac-tion or in the denominator—is completely divorced from the concept of "gross income" for federal income tax purposes. Consequently, the Department's claim that the legislature intended "gross income" under Indiana Code § 6–5.5–1–17(d)(2) to be a subset of "gross income" as defined under Section 61 of the Internal Revenue Code is incorrect.

Furthermore, because the flush language of Indiana Code § 6–5.5–1–17(d)(2) provides what constitutes "gross income" for purposes of determining whether a taxpayer qualifies to pay the FIT, it does not compare oranges to apples as the Department alleges. Indeed (and in perhaps more simple terms), under Indiana Code § 6–5.5–1–17(d)(2), the denominator of the FIT fraction *is* the flush language. The numerator, on the other hand, is that portion of the flush language earned by the three previously listed activities. Thus, under Indiana Code § 6–5.5–1–17(d)(2), the numerator of the FIT fraction is a subset of the denominator of the FIT fraction.

## CONCLUSION

For the above stated reasons, the Court has determined that CAT's gross income from its finance leases is its gross rental receipts, without any deductions. Under such a calculation, CAT qualifies as a FIT taxpayer under Indiana Code § 6–5.5–1–17(d)(2). Accordingly, the Court GRANTS CAT's motion for summary judgment.

## *ORDER*

Upon motion of the Petitioner, by counsel, and the Court being otherwise sufficiently advised, it is hereby ordered that Petitioner's Motion to Publish the Court's Order on Petitioner's Motion for Summary Judgment in this Matter is GRANTED

and this Court's September 12, 2005 Order
is hereby ordered to be published.